Argued and submitted March 8, affirmed April 3, 1985

GORDON et al,
*Petitioners,*

*v.*

CLACKAMAS COUNTY et al,
*Respondents.*

(84-077; CA A34618)

698 P2d 49

Richard C. Stein, Salem, argued the cause for petitioners. With him on the brief was Ramsay, Stein, Feibleman & Myers, Salem.

Michael E. Judd, Chief Assistant County Counsel, Oregon City, argued the cause and filed the brief for respondent Clackamas County.

Susan M. Quick, Portland, argued the cause for respondent Port of Portland. With her on the brief were Stephen T. Janik, and Ball, Janik & Novack, Portland.

Before Joseph, Chief Judge, and Van Hoomissen and Young, Judges.

JOSEPH, C. J.

## JOSEPH, C. J.

Petitioners seek review of the Land Use Board of Appeals' affirmance of Clackamas County's land use decisions allowing the Port of Portland to expand and increase the basing capacity of an airport in the Mulino area. We affirm.

■■ Three of petitioners' four assignments challenge LUBA's conclusion that the county's exceptions to Goals 3 and 4 are consistent with ORS 197.732(1)(c) and with the applicable exceptions rule, OAR 660-04-022(1). Although petitioners make a heroic effort to cast their arguments as points of law, we conclude that the first three assignments fail, because—as relevant to our decision[1]—they are defeated by findings by the county that LUBA correctly concluded are supported by substantial evidence. *See* ORS 197.835(11), 197.850(8).[2]

■ We reject petitioners' fourth assignment of error for essentially the same reason. The airport is located in an area that the county's comprehensive plan designates as the Principal River Conservation Area (PRCA) of the Molalla River. Policy 3 of the plan provides that there must be a "buffer or filler strip of natural vegetation along all river and stream banks." The maximum depth of the buffer under Policy 3 is 150 feet, but the policy makes the depth in any given instance a variable based on a number of factors, including the "proposed use or development." Policy 10.2(a) of the plan provides that, in the PRCA, "tree cutting" and certain other activities are prohibited in the "vegetative fringe * * * along the river." Policy 10.2(a) contains an express reference to Policy 3.

LUBA stated:

"We understand Policy 10.2(a) to prohibit cutting in the 'vegetative fringe,' but the depth of that fringe (or buffer) is up to the county to establish pursuant to plan Policy 3."

LUBA then quoted the county's finding that

---

[1] OAR 660-04-022(1)(b) and (c) state disjunctive reasons that can justify an exception. LUBA concluded that "the county's analysis is sufficient to meet OAR 660-04-022(1)(b) *or* (c)." (Emphasis in original.) We do not need to decide whether LUBA's conclusion regarding subsection (b) is correct.

[2] Petitioners also contend that LUBA's statement of "reasons which set forth the basis for the determination that the exception standards have or have not been met" is not sufficient to satisfy ORS 197.732(6)(c). We disagree.

"the proposed public use will provide such a vegetative fringe buffer along the banks of the river. No tree cutting will take place in this area. The vegetative buffer will range in width from a minimum of 50 feet on the north bank of the river up to 100 feet along the south bank of the Molalla. Along the north bank of the river there is approximately a 50 foot elevation difference between the river level and top of bank elevations. Vegetation on the embankment will not be removed. Along the top of the embankment, only vegetation constituting an obstruction or 'hazard to air navigation' based on FAA guidelines will be removed. Therefore, Policy 3 and Policy 10.2 are met in that a buffer strip of natural vegetation left in its natural state will remain."

LUBA concluded:

"The only cutting which will occur, as we understand the county's finding, is along the top of the north embankment. We understand the finding to say this area is outside the buffer established under Policy 3. A vegetative fringe will be maintained, and there will be no cutting within that fringe."

Petitioners contend that LUBA erred by holding that the proposed airport expansion complies with the comprehensive plan provisions. Part of petitioners' argument is devoted to contentions that they made and that LUBA accepted in a previous appeal from the county's approval of the Port's airport expansion proposal. The present appeal is from the county's decision after LUBA's remand, and we do not find the issues petitioners resurrect from the earlier appeal to be decisive here. In the first appeal, LUBA found a county zoning ordinance provision purporting to except public uses from the buffer strip requirement to be in conflict with the comprehensive plan. Although LUBA reiterated that conclusion in a footnote to its opinion in the present appeal, its disposition of the issue raised by petitioners' fourth assignment was based solely on the comprehensive plan.

Petitioners' arguments that are relevant to *this* appeal are that "there is nothing in the record to establish that a buffer strip of any width will be maintained" and that, "[e]ven assuming a buffer strip, there will be tree cutting within it which is prohibited under Policy 10.2(a)."[3] Peti-

---

[3] Petitioners also argue that the contemplated buffer strip has not been shown to be "wide enough or composed of the appropriate vegetation to prevent erosion and

tioners do not argue that LUBA was incorrect in its conclusion that Policies 3 and 10.2(a) are interrelated. They do not argue that, contrary to LUBA's conclusion, Policy 3 gives the county no discretion over the dimensions of the buffer.[4] Their only serious challenge is to the county's findings.

The Port and the county argue that there was substantial evidence to support the county's findings and that the facts found establish compliance with the applicable provisions of the plan as LUBA interpreted them. We agree.

However, the county urges that, instead of affirming LUBA's order on that basis, we should affirm on the alternative ground that the county interpreted the provisions of its comprehensive plan and ordinances as not requiring *any* buffer strip under these circumstances; that LUBA's interpretation of the county's provisions is at variance with the county's interpretation; and that a "municipality's interpretation of its own enactment 'is entitled to weight unless it is clearly contrary to the express language and intent' of the enactment" (citing *Fisher v. City of Gresham,* 69 Or App 411, 416, 685 P2d 486 (1984)).

Although it is unnecessary for us to address the county's alternative argument to decide this case, we choose to do so, because the same or similar arguments have been made to us with some frequency in recent land use cases. The extreme version of the argument—which, we recognize, is not the version the county advances here—posits that LUBA and the courts are powerless to interpret local legislation differently from the local government's interpretation, if the latter is not clearly contrary to the language and intent of the legislation. That argument may have its genesis in imprecise language in some of the Supreme Court's and our opinions relating to judicial "deference" to local interpretations and

---

maintain and improve water quality as required by the Comprehensive Plan Goals previously cited." They argue further that "[t]here must be a finding by Clackamas County supported by substantial evidence that the buffer will fulfill the goals of the Comprehensive Plan." Petitioners do not direct our attention to anything in Policies 3 or 10.2(a) or elsewhere that requires the showing or the findings that they assert were not made.

[4] We do not suggest that petitioners should have made either argument. The point of our comment is that, in the present posture of the case, the issues that are before us—and, arguably, the only colorable issues that *could* be raised—are factual rather than legal.

relating to the right and duty of local governments to construe their own legislation in the first instance.

However, it has *never* been the law that LUBA or the courts are in any way *bound* by local interpretations. The Supreme Court explained in *Fifth Avenue Corp. v. Washington Co.,* 282 Or 591, 599, 581 P2d 50 (1978):

> "*The courts are finally responsible,* but we believe that it is the [local governing body] itself, composed as it is of popularly elected local officials directly accountable to their constituency * * * that, in the first instance, should have the power and right to interpret local enactments. *Cf. Green v. Hayward,* 275 Or 693, 706, 552 P2d 815 (1976) (interpretation of county comprehensive plan).

> "*While the interpretation of the board cannot supplant our duty, that interpretation is entitled to some weight* unless it is clearly contrary to the express language and intent of the [legislation]." (Emphasis supplied.)

*See also Fisher v. City of Gresham, supra,* 69 Or App at 416; *West Hills & Island Neighbors v. Multnomah Co.,* 68 Or App 782, 786, 683 P2d 1032, *rev den* 298 Or 150 (1984). The meaning of local legislation, like the meaning of any statutory language, is a question of law that the courts and other reviewing tribunals must decide. The weight that local interpretations should be accorded in connection with such decisions is instructive rather than binding in nature. The courts cannot be finally responsible for the interpretation of legislation if they are bound to follow the interpretations of those who do not have final responsibility.

Affirmed.